IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

SAMUEL R. SPENCER                                                      PLAINTIFF

v.                                                    CIVIL ACTION NO. 1:23-CV-91-SA-DAS

PLUMROSE USA, INC.;
AMERICAN ZURICH INSURANCE COMPANY; and
SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.                              DEFENDANTS

ORDER AND MEMORANDUM OPINION

On May 23, 2023, Spencer initiated this lawsuit when he filed his Complaint [2] in the

Circuit Court of Prentiss County, Mississippi. The Defendants removed the case to this Court on

the basis of diversity jurisdiction. The Defendants have since filed separate Motions for Summary

Judgment [48, 50, 57], which are now ripe for review. Having considered the parties' filings, along

with the relevant authorities, the Court is prepared to rule.

*Relevant Background*

This case stems from an injury that Spencer sustained on April 25, 2019 within the course

and scope of his employment with Plumrose USA. At all relevant times, American Zurich

Insurance Company provided workers' compensation insurance to Plumrose. Sedgwick Claims

was the third-party administrator that handled Spencer's claim.

Plumrose is engaged in the business of slicing and packaging deli meats for distribution.

Spencer was a longtime employee of Plumrose prior to the subject injury. The injury itself occurred

when Spencer moved a stick of deli meat weighing approximately 40 pounds from an overhead

drying rack to put it in a slicer. Spencer felt pain in his right shoulder at that time. He underwent

relatively significant medical treatment and ultimately was diagnosed with a torn rotator cuff,

among other things. He had surgery on June 17, 2019 and underwent a second surgical procedure

on October 11, 2019. He was prescribed physical therapy treatment. He then participated in

physical therapy at Performance Physical Therapy from October 14, 2019 through January 20, 2020. After Spencer underwent an MRI on February 13, 2020, Dr. Taylor Mathis determined that Spencer had attained Maximum Medical Improvement.

In an Order dated November 2, 2020, the Administrative Law Judge ordered Plumrose and Zurich to pay workers' compensation benefits to Spencer in pertinent part as follows:

> 1. Temporary total disability benefits at the rate of $360.02 a week for any time that Claimant missed from work do to [sic] his injury between April 25, 2019 and February 13, 2020, with credit for any payments made by the Employer/Carrier;

> 2. Permanent partial disability benefits at the rate of $360.02 a week beginning February 13, 2020, and continuing for 100 weeks, with credit for any such benefits already paid by the Employer/Carrier.

[2] at p. 32.

On January 13, 2021, the Workers' Compensation Commission approved and filed an Order Granting Application for Compromise Settlement, which was jointly presented by counsel for Spencer and counsel for the Employer/Carrier. That Order, in pertinent part, approved:

> It is, therefore, ordered that said compromise settlement should be, and the same is hereby approved and that JBS USA, LLC and America Zurich Insurance Company shall pay to Samuel R. Spencer, Claimant, the sum of $30,000.00, all inclusive, without discount, in addition to any compensation and medical benefits heretofore paid, in complete settlement of all claims of every kind and nature, arising out of or in any way related to this claim or those injuries or conditions alleged herein. The settlement amount includes any back temporary total disability benefits and permanent partial disability benefits owed to Claimant. Employer and Carrier will be responsible for payment of all outstanding medical expenses incurred as of December 30, 2020, that are in the proper chain of referral, causally related to Claimant's injury of April 25, 2019, and reasonable and medically necessary . . . Claimant will be responsible for payment of all other outstanding and future medical expenses.

[57], Ex. 1 at p. 1-2.[1]

The Order also authorized Spencer to enter into a settlement agreement. Consistent with that authorization, Spencer signed a receipt and release agreement, wherein he agreed as follows:

> FOR AND IN CONSIDERATION of the sum of Thirty Thousand and No/100 Dollars ($30,000.00), cash in hand paid, receipt of which is hereby acknowledged, I, Samuel R. Spencer, do hereby fully, completely and finally release, discharge, and acquit JBS USA, LLC and American Zurich Insurance Company from any and all claims which I may now or hereafter have under the terms of the Mississippi Workers' Compensation Law, or otherwise, on account of, arising out of, or connected with my sustaining personal injuries on or about April 25, 2019.
>
> It is further understood that this payment has heretofore been approved by the Mississippi Workers' Compensation Commission in docket number 1903654-P-9748, and is accepted by me in full and complete settlement, compromise, accord and satisfaction of all claims that I may now or hereafter have because of, arising out of, or connected with said accidental injuries, against said Employer and Carrier, and their agents, servants and employees, and any other party in privity with any of them.

[57], Ex. 2 at p. 1.

Spencer signed the receipt and release agreement ("release agreement") on January 18, 2021. Nonetheless, as indicated above, on May 23, 2023, he initiated this lawsuit. In his Complaint [2], Spencer walks through in detail his medical treatment and the processing of his workers' compensation claim. He also contends that after the execution of the release agreement, Plumrose and Zurich failed to timely pay the medical bills for Spencer's treatment. He articulates the steps taken to obtain payment for those medical bills as follows:

> On March 16, 2021, Counsel for Claimant wrote to Attorney Robert Stacy, Counsel for the Employer and Carrier, advising of unpaid Performance Physical Therapy bills.

---

[1] For the sake of clarity, "JBS USA, LLC" is one and the same as Plumrose.

On April 20, 2021, Counsel for Claimant wrote to Attorney Robert Stacy, Counsel for the Employer and Carrier, advising of unpaid Performance Physical Therapy bills.

On July 20, 2021, Charlene with Performance Physical Therapy faxed the Performance Physical Therapy account ledger to the office of Daniel Coker pursuant to their request.

On July 28, 2021, Charlene with Performance Physical Therapy faxed another ledger to the office of Daniel Coker pursuant to their request.

On October 4, 2021, Claimant's Attorney filed a Motion for Claimant to reopen the case because the Carrier had failed to pay medical bills that were submitted.

On October 6, 2021, Charlene with Performance Physical Therapy faxed unpaid claims to Anthony Toto with Sedgwick.

On October 8, 2021, Counsel for the Employer and Carrier filed a Response to Claimant's Motion to Reopen.

On January 19, 2022, Performance Physical Therapy received an additional partial payment in the amount of $42.66 with the remaining charges again denied by the Carrier alleging that they were not timely filed and/or were duplicate claims.

On February 9, 2022, Performance Physical Therapy received payment in the amount of $831.07 as a partial payment for charges of Performance Physical Therapy and the remaining charges were again denied alleging that they were not timely filed and/or were duplicate claims.

On February 10, 2022, Performance Physical Therapy received another partial payment in the amount of $3,907.15 with the remaining charges again being denied alleging they were not timely filed.

On February 15, 2022, Charlene with Performance Physical Therapy faxed the ledger of charges for the Claimant to Anthony Toto and Attorney J. Miles Forks showing outstanding charges of Performance Physical Therapy remained unpaid.

On February 23, 2022, Charlene with Performance Physical Therapy faxed claims that had been denied to Anthony Toto,

> Representative of the Carrier, requesting that those claims be processed.
>
> On April 13, 2022, Performance Physical Therapy received another partial payment in the amount of $229.31 with the remaining charges again being denied for alleged untimely filing.
>
> On April 13, 2022, Charlene with Performance Physical Therapy faxed a request to Anthony Toto, Representative of the Carrier, and to J. Miles Forks, attorney for the Employer and Carrier, requesting that the remaining unpaid claims be paid.
>
> On May 4, 2022, Performance Physical Therapy received a final payment of the Performance Physical Therapy charges in the amount of $318.73.

[2] at p. 9-11.

Spencer asserts claims against Plumrose, Zurich, and Sedgwick. In Count One, he asserts a bad faith claim against all three Defendants for their respective roles in the handling of his workers' compensation claim. In Count Two, he asserts a breach of contract claim, alleging that they had in place a contract to "provide reasonable and adequate insurance coverage" to him and failed to do so. In Counts Three and Four, he asserts claims for negligent infliction of emotional distress and breach of implied duties.

### *Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

Through the pending Motions [48, 50, 57], the Defendants seek summary judgment in their favor on all claims. Although they made separate filings, their respective positions are largely the same, and the Court will analyze them together. However, the Defendants make a noteworthy distinction for purposes of the applicable analysis to Spencer's claims. They separate Spencer's claims based upon alleged conduct that occurred prior to the execution of the release agreement on January 18, 2021, and alleged conduct that occurred after the execution of the release agreement. As to the pre-release claims, the Defendants contends that the release agreement acts as a bar to recovery. The Defendants make the same argument as to the post-release claims, but

they also contend that Spencer lacks standing to pursue the post-release claims asserted in his Complaint [2].

The Court will first address Spencer's pre-release claims and then turn to the post-release claims.

## I.    Pre-Release Claims

Again, the Defendants contend that the release agreement Spencer executed acts as a bar to recovery. The Defendants rely on *Ward v. Royal Ins. Co. of Am.*, 662 F. Supp. 1079 (S.D. Miss. 1986) and its progeny.[2] Generally speaking, in *Ward*, the District Court for the Southern District of Mississippi held that the plaintiff's execution of a release in the underlying workers' compensation case precluded subsequent claims for bad faith. 662 F. Supp. at 1080-81. The District Court for the Southern District of Mississippi again applied this rule in 2015, holding under similar facts that "[b]ecause the language in the Release clearly and unambiguously discharges and releases Defendants from any and all claims relating to or arising out of the work accident, the bad faith and emotional distress claims brought by Plaintiff in this case are barred." *Brewer v. Liberty Mut. Ins. Co.*, 2015 WL 3620468, at *4 (S.D. Miss. June 9, 2015).[3]

Most recently, the District Court for the Southern District of Mississippi addressed the issue in *Peckinpaugh v. Asplundh Tree Expert, LLC*, 2022 WL 19001847 (S.D. Miss. Sept. 20, 2022). There, the plaintiff, Darrell Peckinpaugh, suffered a work-related injury while working on the job as a tree cutter for Asplundh. *Id*. at *2. LM provided workers' compensation insurance to Asplundh at the time of Peckinpaugh's injury. *Id*. After his claim was initially denied, Peckinpaugh later received approval from the Mississippi Workers' Compensation Commission and settled his

---

[2] *Ward* was affirmed by the Fifth Circuit without a written opinion. *See Ward v. Royal Ins. Co. of Am.*, 820 F.2d 1222 (5th Cir. 1987).
[3] The Fifth Circuit affirmed *Brewer* in a brief *per curiam* opinion. *See Brewer v. Liberty Mut. Ins. Co.*, 628 F. App'x 279 (5th Cir. 2016) (per curiam).

claims with LM and Asplundh for the amount of $140,000. *Id*. In pertinent part, the settlement agreement provided:

> I, Darrell J. Peckinpaugh, do hereby fully, completely and finally release, discharge and acquit Asplundh Tree Expert Company and LM Insurance Corporation from any and all claims which I may now or hereafter have under the terms of the Mississippi Workers' Compensation Law, on account of, arising out of, or connected with my sustaining personal injuries on or about June 9, 2016.
>
> It is further understood that this payment has heretofore been approved by the Mississippi Workers' Compensation Commission in docket number 1605543-P-2195, and is accepted by me in full and complete settlement, compromise, accord and satisfaction of all claims of every kind and nature arising out of those injuries or conditions resulting from said accidental injuries, as alleged in my workers' compensation claim filed in docket number 1605543-P2195, against said employer and carrier, and their agents, servants and employees, and any other party in privity with any of them.

*Id*.

After entering into the settlement agreement on March 24, 2020, Peckinpaugh initiated litigation on January 22, 2021, by filing his complaint alleging that Asplundh and LM should be held liable for bad faith breach of contract and bad faith *per se*. *Id*. The defendants sought summary judgment in their favor on the basis that Peckinpaugh had forfeited the claims when he signed the settlement agreement. *Id*. at *3. Peckinpaugh argued that the language of the settlement agreement was not so broad as to preclude a bad faith claim but, instead, it only pertained to his workers' compensation claim. *Id*. at *5. The district court looked to Mississippi law on this issue and ultimately rejected Peckinpaugh's argument:

> This court applies the Mississippi Court of Appeals holding in *Thornhill v. Walker-Hill Env't*, 2021 WL 4888440, at *2 (Miss. Ct. App. Oct. 19, 2021) in analyzing Plaintiff's contentions. The general release at issue in *Thornhill* included a statement, drafted by the plaintiff's counsel, that "Thornhill reserves and does not release, however, the right to bring a claim for bad faith against any party. . ." 2021 WL 4888440, at *2. The parties in *Thornhill* did not dispute,

> and the Mississippi Court of Appeals agreed, that this language specifically carved out a bad faith claim from the general release executed in the workers' compensation settlement. *Id*.
>
> Here, Plaintiff's counsel did not submit such language, nor has any specific language carving out a bad faith claim been incorporated into the Release. This court notes that, pursuant to Mississippi jurisprudence, if Plaintiff's intentions were to preserve his bad faith claims, he could have done so by inserting specific language.

*Id*. (some citations omitted).

The district court granted summary judgment in the defendants' favor, holding that "[t]his court, in lockstep with the holdings in *Ward* and *Brewer*, finds that Plaintiff's Release, discharging Defendants 'of all claims arising out of or relating to a work-related accident' effectively released his claims for bad faith connected to Plaintiff's Workers' Compensation claim." *Id*. at *5.

As emphasized previously, the Defendants urge the Court to apply *Peckinpaugh* and hold that Spencer's claims are precluded. In response, Spencer attempts to distinguish between claims that accrued *before* he signed the receipt and release and claims that accrued *after* he signed. He argues that "all of the acts of the Defendants which Plaintiff alleges constituted bad faith on the part of the Defendants occurred after the settlement and Release as the result of the Defendants refusing to pay medical bills, particularly the charges of Performance Physical Therapy, Inc., causing Plaintiff through Counsel to file a Motion to Reopen because of the failure and refusal of American Zurich Insurance Company to pay outstanding charges owed to Performance Physical Therapy in the amount of $7,322.48." [61] at p. 2.

Although Spencer, in his Response Memorandum [61], contends that his claims are only based upon post-release conduct, his Complaint [2] includes numerous allegations of pre-release conduct, such as "refusal to report Plaintiff's injury by his supervisor; denial of Plaintiff's claim for Workers' Compensation benefits by Anthony Toto, Claims Examiner for Sedgwick Claims

Management Services, Inc., a representative of the Workers' Compensation's Carrier, American Zurich Insurance Company; denial of approval for the requested MRI by Defendants[,]" among several others. [61] at p. 12.

In other words, the arguments made in the Response Memorandum [61] are inconsistent with the allegations contained in the Complaint [2]. However, the Court construes Spencer's argument in his present filing as a concession that he cannot proceed on any claims related to pre-release conduct. Even if he did not so concede, the Court, in line with *Peckinpaugh* and the other cases cited by the Defendants, concludes that such claims are precluded. The release agreement contains broad release language and, like the settlement agreement language at issue in *Peckinpaugh*, contained no carve out for any of the claims that Spencer now brings in this litigation. Therefore, to the extent that the Complaint [2] asserts claims related to any conduct that occurred prior to the date the receipt and release was signed—January 18, 2021—such claims are hereby DISMISSED *with prejudice*.

## II. Post-Release Claims

To reiterate, these claims are, in Spencer's words, based upon "[t]he continuous delay by the Defendants in paying the medical bills of Plaintiff[.]" [61] at p. 3. To narrow the relevant time period, the receipt and release was signed on January 18, 2021, and the final payment of medical bills was made on May 2, 2022. Spencer contends that during this approximately 16-month period, his counsel filed a motion to reopen before the Workers' Compensation Commission and engaged in other efforts to ensure that the medical bills were paid.

As indicated above, the Defendants argue that, in addition to the release agreement acting as a bar, Spencer lacks standing to pursue these claims.

Because standing must be established at the outset, the Court will address that argument first. *See*, *e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) ("Standing to sue is part of the common understanding of what it takes to make a justiciable case.") (citations omitted).

Contending that Spencer lacks standing to pursue these claims, the Defendants argue that "even assuming *arguendo* that any payments were delayed, it is undisputed that [Spencer] did not suffer any injury. Third-party medical providers may or may not have been injured by purported delayed payments post-release, but any putative injury does not confer standing upon [Spencer]." [58] at p. 8. Stated simply, the Defendants contend that any delayed payment claim would be a claim belonging to the third-party medical providers—not Spencer.

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood. The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) (citations omitted). "The 'essence' of standing is 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)).

The Supreme Court has explained that the "irreducible constitutional minimum" of standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338, 136 S. Ct. 1540 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). The plaintiff

11

bears the burden to establish standing. *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990)).

Here, the Defendants' argument goes to the first element—the injury in fact requirement.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339, 136 S. Ct. 1540 (quoting *Lujan*, 504 U.S. at 560, 112 S. Ct. 2130). Notably, "[a] plaintiff who merely asserts an injury suffered by third parties does not have standing as to that claim." *Preston v. Good Nature Cafe*, 33 F. App'x 704 (5th Cir. 2002) (per curiam) (citing *Lujan*, 504 U.S. at 562, 112 S. Ct. 2130). In other words, "a plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Ward v. Santa Fe Indep. Sch. Dist.*, 393 F.3d 599, 606 (5th Cir. 2004) (emphasis previously added; citations omitted). "[T]he United States Supreme Court has developed prudential limitations on standing, including a requirement that a litigant generally must assert his or her own legal rights and interests and cannot rest a claim to relief on the legal rights or interests of third parties." *Id.* (citing *Warth*, 422 U.S. at 499, 95 S. Ct. 2197).

The Defendants contend that "[t]hird party medical providers may or may not have been injured by alleged delayed payments post-release, but their putative injury does not confer standing upon Mr. Spencer." [49] at p. 6. In response, Spencer concedes that he "did not suffer any monetary injury" but states that he "suffered an emotional injury as a result of his medical bills not being timely paid." [63] at p. 4. When questioned at his deposition about the injuries he suffered because of the Defendants' allegedly wrongful conduct, Spencer testified as follows:

Q. So I think we've established that you finished your medical treatment related to the accident sometime before September, 2020. Right?

A. Correct.

Q. Which means that there was no reason for you to go back and see your doctor or therapist after that. Correct?

A. Correct.

Q. Okay. So at any point after September, 2020, did you receive any communication, contact, calls, letter from any of your medical providers about your past due accounts after you finished your treatment in 2020?

A. No, sir.

Q. Okay. Do you know whether any of your medical providers reported your past due accounts that would affect your credit account or your credit score? Do you know if that ever happened?

A. I don't know.

Q. Did you ever get any communication that that had happened?

A. I did not.

Q. Okay. So in reading over documents in this case, it looks to me like the main complaint that you have is that after your settlement it was several months before Performance Physical Therapy's bills were paid off?

A. Correct.

. . .

A. Well, it stressed me out quite a bit because my bills weren't getting paid.

Q. Okay. Did it affect you financially? Out of pocket anything?

A. No, sir.

13

. . .

Q.      So tell me about that. Just in your own words, how did that cause emotional distress and anxiety for you?

A.      Well, I'm just one that likes to pay my bills on time and everything. And if I would see someone from physical therapy, I would know that I haven't paid my bill and I know they're thinking about, you know, well, Sam hasn't paid his bill. I didn't know what to tell them.

. . .

Q.      All right. So you specifically remember seeing four people from Performance Physical Therapy out in town after your settlement?

A.      Yes, sir.

Q.      Okay. And you talked to them each time?

A.      Yes, sir.

Q.      And was there any conversation at all about your past due bills or not getting paid that you can recall or was it more, hey, how are you doing, kind of thing?

A.      It was just, hey, how are you doing. But I could just -- I believe they were thinking about, you know, Sam you haven't paid your bill. But nobody said anything.

Q.      Okay. They were nice?

A.      Very nice.

Q.      Okay. And, obviously, you're not a mind reader. Correct?

A.      Obviously not, no.

[57], Ex. 4 at p. 3-6.

After referencing his deposition testimony, Spencer directs the Court's attention to the Mississippi Supreme Court's 1984 decision in *Southern Farm Bureau Cas. Ins. Co. v. Holland*, 469 So. 2d 55 (Miss. 1984). There, the plaintiff, Clara Holland, underwent back surgery in

December 1977 following a work-related injury. *Id*. at 56. Southern Farm Bureau was the workers' compensation insurance carrier for Holland's employer. *Id*. Southern Farm Bureau "paid Ms. Holland's medical bills and temporary total benefits until July 26, 1979, when it terminated her benefits on medical advice." *Id*. However, "[f]ollowing an order of the Mississippi Workers' Compensation Commission of September 8, 1981, the carrier resumed payment of temporary total disability benefits to Ms. Holland." *Id*. Holland then filed suit alleging that the "intentional refusal of the insurance carrier to pay workers' compensation benefits was calculated to force her into an inadequate settlement of her claim and constituted a tortious breach of contract, a breach of fiduciary duties and the intentional infliction of mental distress[.]" *Id*.

After the circuit court denied its motion to dismiss based upon the exclusivity provision of the Mississippi Workers' Compensations Act, Southern Farm Bureau filed an interlocutory appeal. *Id*. The Mississippi Supreme Court framed the pertinent issue on appeal as follows: "whether the exclusive remedy clause of the Mississippi Workers' Compensation Act bars a claimant, who has sustained an injury covered by the Act, from maintaining an action against the insurance carrier for the commission of intentional torts in the processing of a worker's compensation claim." *Id*. The court ultimately concluded that the Act does not preclude an individual's ability to pursue an intentional tort claim. *Id*. at 58. In reaching this conclusion, the court considered the specific language of the Act and determined that "[t]he independent tort is not compensable under our Workers' Compensation Act and to extend immunity to compensation carriers for a separate injury to workers goes far beyond the intent of the act." *Id*. at 59.

In this Court's view, *Holland* does not establish standing here. Unlike this case, the unpaid benefits were owed directly to the plaintiff, as opposed to a medical provider. Furthermore, the Court notes that the pertinent issue in the case at bar is not whether the Mississippi Workers'

Compensation Act bars an independent tort claim—this Court recognizes that it does not. Rather, the issue is whether Spencer maintains standing to pursue a claim based upon the Defendants' alleged failure to timely make payment to his medical providers after Spencer entered into the release agreement with the Defendants. In short, *Holland* does not establish standing.

While not referenced by the parties, the Court has located additional case law wherein the Fifth Circuit addressed standing more recently. The Court first notes the Fifth Circuit's 2022 decision in *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445 (5th Cir. 2022). There, Randy Denning received outpatient care for chronic pain with medication administered via a pain pump. *Id.* at 448. AIS, which is a national compounding pharmacy, filled Denning's prescriptions. *Id.* As the Fifth Circuit explained it, "Denning signed two agreements with AIS in October 2019. The first authorized AIS to provide services to Denning pursuant to the orders of her physician. The second assigned to AIS insurance benefits payable for products or services provided by the pharmacy." *Id.* A dispute arose between Denning and AIS when "[i]n February 2021, Denning discovered that AIS had billed her insurer at a daily rate of $120 for services that she alleges neither she nor her physician had authorized." *Id.*

Denning filed suit seeking compensatory and punitive damages for breach of contract, unjust enrichment, and fraudulent misrepresentation. *Id.* at 448-49. AIS argued that Denning lacked standing, averring that "Denning had not alleged that she paid any of the billed amounts or that AIS had threatened collection proceedings against her. Rather, she had alleged only that her insurer wrongfully paid for billed services. Thus, AIS argued, Denning had suffered no financial loss and allegedly could not show an injury for standing purposes." *Id.* at 449. The district court agreed with AIS and held that Denning could not establish the injury in fact requirement or the redressability requirement. *Id.*

16

On appeal, the Fifth Circuit held that Denning had "shown an injury in fact through her breach of contract claims." *Id*. at 451. In reaching this conclusion, the court explained that, regardless of the amount of damages, "a breach of contract is a sufficient injury for standing purposes." *Id*. However, the Fifth Circuit nevertheless affirmed the district court's ruling on the basis that there was no redressability. *Id*. The court explained that "[t]his is because her injury, as she alleges it, is not redressable by the compensatory and punitive damages that she seeks. Put another way, rendering an award of damages in favor of Denning does not redress her insurer's injury of being subject to AIS's unauthorized billing practices." *Id*. at 451-52 (citations omitted).

This Court finds a critical distinction between *Denning* and the case at bar. In *Denning*, the Fifth Circuit specifically held that the injury in fact requirement was satisfied on the basis of a breach of contract. Here, though, Spencer has provided no contract to which he was a party that would indicate a duty of the Defendants to timely pay the medical providers. In other words, although there may very well be a contractual relationship between the Defendants and the medical providers, Spencer has not attached any documentation to indicate that he is a party to any such contract. Thus, this Court finds *Denning* distinguishable in that respect.

Considering the evidence in the record in this case, the Court does recognize that Spencer, unlike the plaintiff in *Denning*, has testified as to *some* purported damages because of the Defendants' delay. As emphasized above, he testified:

> Q.  So tell me about that. Just in your own words, how did that cause emotional distress and anxiety for you?
>
> A.  Well, I'm just one that likes to pay my bills on time and everything. And if I would see someone from physical therapy, I would know that I haven't paid my bill and I know they're thinking about, you know, well, Sam hasn't paid his bill. I didn't know what to tell them.

[57], Ex. 4 at p. 5.

Notably, when pressed further on that point, Spencer admitted that none of the employees that he saw ever asked him about any unpaid bills. Likewise, he admitted that he did not suffer any out of pocket expenses and his credit was not impacted in any way because of the purported delay. Put simply, he has not come forward with any summary judgment type evidence to support any concrete and particularized injury. *See Denning*, 50 F.4th at 451 (quoting *Spokeo*, 578 U.S. at 339, 136 S. Ct. 1540) ("To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, *not conjectural or hypothetical*.") (citations and quotation marks omitted; emphasis added). Spencer has alleged only that he believes—without any evidence to support the same—that certain individuals he saw in the community were "thinking about" him not paying his medical bills. [57] Ex. 4 at p. 5. This is not an injury in fact sufficient to establish standing.

Furthermore, even assuming an injury in fact, Spencer cannot, in this Court's view, establish redressability. Like in *Denning*, payment of damages to Spencer would not redress the medical provider's purported injury attributable to delayed payments.[4]

Ultimately, the Court finds that Spencer lacks standing to pursue his post-release claims.

However, setting aside the lack of standing, the Court, out of an abundance of caution, turns to the Defendants' substantive argument that the release agreement nevertheless bars the claims that occurred thereafter.

"Mississippi law favors voluntary agreements to compromise and settle disputes." *Taylor v. Reliance Well Serv., Inc.*, 220 So. 3d 260, 263 (Miss. Ct. App. 2017) (citing *Estate of Cole v. Ferrell*, 163 So. 3d 921, 925 (Miss. 2012); *Parmley v. 84 Lumber Co.*, 911 So. 2d 569, 573 (Miss.

---

[4] In reaching this conclusion, the Court notes that Spencer's case is slightly different in the redressability aspect insofar as he alleges he suffered emotional damages. However, the Court has already addressed above that those purported damages are insufficient.

Ct. App. 2005)). "Settlement agreements are contracts made by the parties, upon consideration acceptable to each of them, and the law will enforce them. Courts will not rewrite them to satisfy the desires of either party." *Chantey Music Pub., Inc. v. Malaco, Inc.*, 915 So. 2d 1052, 1056 (Miss. 2005) (citing *East v. East*, 493 So. 2d 927, 932-33 (Miss. 1986)) (additional citation omitted).

Courts should apply the standard rules of contract interpretation to settlement agreements. *Peckinpaugh*, 2022 WL 19001847 at *6; *see also Taylor*, 220 So. 3d at 263 (holding that a "settlement is a contract, and like any other contract, it will be enforced according to its terms based on general principles of contract law."). "In interpreting settlement agreements, Mississippi courts 'have set out a three-tiered approach.'" *Brewer*, 2015 WL 3620468 at *2 (quoting *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278, 284 (Miss. 2005)). That approach is as follows:

> First, the "four corners" test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement. Second, if the court is unable to translate a clear understanding of the parties' intent, the court should apply the discretionary canons of contract constructions. Finally, if the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic or parol evidence. It is only when the review of a contract reaches this point that prior negotiations, agreements and conversations might be considered in determining the parties' intentions in the constructions of the contract.

*Id*.

Notably, a reviewing court need not proceed beyond the first step if the contract is unambiguous. *See Gaiennie v. McMillin*, 138 So. 3d 131, 136 (Miss. 2014) ("When a contract is clear and unambiguous, the Court is not concerned with what the parties may have meant or intended but rather what they said, for the language employed in a contract is the surest guide to what was intended.") (quoting *Ivison v. Ivison*, 762 So. 2d 329, 335 (Miss. 2000)) (quotation marks and additional citation omitted).

Although set forth above, the Court again notes the language of the parties' agreement:

> FOR AND IN CONSIDERATION of the sum of Thirty Thousand and No/100 Dollars ($30,000.00), cash in hand paid, receipt of which is hereby acknowledged, I, Samuel R. Spencer, do hereby fully, completely and finally release, discharge, and acquit JBS USA, LLC and American Zurich Insurance Company from any and *all claims which I may now or hereafter have under the terms of the Mississippi Workers' Compensation Law, or otherwise, on account of, arising out of, or connected with my sustaining personal injuries on or about April 25, 2019.*
>
> It is further understood that this payment has heretofore been approved by the Mississippi Workers' Compensation Commission in docket number 1903654-P-9748, and is accepted by me in full and complete settlement, compromise, accord and satisfaction of all claims *that I may now or hereafter have because of, arising out of, or connected with said accidental injuries, against said Employer and Carrier, and their agents, servants and employees, and any other party in privity with any of them.*

[57], Ex. 2 at p. 1 (emphasis added).

The language of the agreement is broad—but not ambiguous. Spencer clearly and unambiguously agreed to release not only the claims that he possessed at that time but also any claims that he might "hereafter have" against the Defendants on account of or "connected with" his work-related injury. *Id*. His present claims are undoubtedly "connected with" his work-related injury, as his claim is that the Defendants failed to timely pay medical bills for treatment he admittedly received for his work-related injury. In addition, the release agreement was not limited to claims for workers' compensation but specifically indicates that it extends to claims "under the terms of the Mississippi Workers' Compensation Law, *or otherwise*[.]" *Id*. (emphasis added). This language clearly extends the release agreement beyond only workers' compensation claims.

The Court finds pertinent and applicable the district court's analysis in *Ward* when analyzing the effect of the parties' release:

20

> In the case at bar, Ward has not alleged fraud, deceit or breach of fiduciary relations by Royal. This is not a case in which one party had the advantage over the other party in experience, knowledge and wisdom, since Ward signed the release on advice of counsel who also signed the release and presumably informed Ward of his rights and consequences of executing the release. Moreover, Ward signed the release with full knowledge of any alleged wrong by Royal committed prior to the execution of the release. If Ward believed he had been wronged by Royal, he could have brought suit against Royal to enforce whatever rights he believed he had or, alternatively, he could have reserved the right to sue for bad faith in the agreement itself. Since he did not do so, he is bound by the consequences of his actions.

*Ward*, 662 F. Supp. at 1082.

While this Court recognizes the distinction that Spencer makes—that his claims arose after he signed the release—the Court finds *Ward* to be applicable. Spencer willingly and knowingly signed an agreement releasing, in exchange for $30,000, claims "that [he] *may now or hereafter have* because of, arising out of, or connected with said accidental injuries, against said Employer and Carrier, and their agents, servants and employees, and any other party in privity with any of them." [57], Ex. 2 at p. 1 (emphasis added). Like the plaintiff in *Ward*, Spencer did not specifically reserve any rights to sue. Since the release agreement is unambiguous, the Court need not look beyond its four corners. *See*, *e.g.*, *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 751 (Miss. 2003) ("[I]t is a question of law for the court to determine whether a contract is ambiguous and, if not, enforce the contract as written.").

In addition to the pre-release claims discussed previously, the release agreement precludes Spencer's post-release claims. Those claims are hereby DISMISSED *with prejudice*.

*Conclusion*

For the reasons set forth above, the Motions for Summary Judgment [48, 50, 57] are GRANTED. All claims are DISMISSED *with prejudice*. A Final Judgment will issue this day. This CASE is CLOSED.

SO ORDERED, this the 16th day of July, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE